J-A03043-20

2021 PA Super 230

| | |
|---|---|
| MARVIN L. SLOMOWITZ, IN HIS CAPACITY AS GENERAL PARTNER OF HANOVER ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP, AND IN HIS CAPACITY AS A JOINT VENTURER IN CLARMARK ASSOCIATES, THE GENERAL PARTNER OF FIRST VALLEY ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP, AND IN HIS CAPACITY AS GENERAL PARTNER OF HERSHEY PLAZA ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STUART A. KESSLER, IN HIS CAPACITY AS GENERAL PARTNER OF HANOVER ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP, AND IN HIS CAPACITY AS PARTNER WITH JOHN B. ROSENTHAL, DECEASED, IN CLARIDGE PROPERTIES, THE OTHER JOINT VENTURER IN CLARMARK ASSOCIATES, THE GENERAL PARTNER OF FIRST VALLEY ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP, AND IN HIS CAPACITY AS GENERAL PARTNER OF HERSHEY PLAZA ASSOCIATES, A PENNSYLVANIA LIMITED PARTNERSHIP | |
| Appellant | No. 1247 MDA 2019 |

Appeal from the Order Entered June 25, 2019
In the Court of Common Pleas of Luzerne County
Civil Division at No: 2011-03844

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

OPINION BY STABILE, J.:                    **FILED NOVEMBER 29, 2021**

Marvin Slomowitz ("Slomowitz"), Stuart Kessler ("Kessler"), and John Rosenthal ("Rosenthal") were general partners or joint venturers in three limited partnerships that owned and operated "Section 8"[1] apartment buildings for elderly and low-income people. After Rosenthal died, a protracted dispute began between Slomowitz and Kessler over the management of the limited partnerships. Slomowitz filed an action seeking a declaratory judgment that he had the authority to act on behalf of the limited partnerships without first obtaining the consent or concurrence of Kessler. Kessler filed several counterclaims against Slomowitz, including a counterclaim for declaratory relief and for breach of fiduciary duty. Following non-jury proceedings, on December 31, 2018, the trial court found in favor of Slomowitz on his declaratory judgment action and against Kessler on his counterclaims. The court declared its order final pursuant to Pa.R.A.P. 341(c),

---

[1] "Section 8" is the common name for the Housing Choice Voucher Program, funded by the U.S. Department of Housing and Urban Development (HUD), as provided for under the Housing Act of 1937, 42 U. S. C. § 1437(f). Under the Section 8 program, HUD pays rental subsidies so eligible families can afford decent, safe, and sanitary housing. Section 8 is a housing voucher program generally administered by state or local governmental entities called public housing agencies ("PHAs") and may be "tenant-based" or "project-based." In tenant-based assistance, the assisted unit is selected by the family. The family may rent a unit anywhere in the United States in the jurisdiction of a PHA that runs a voucher program. In project-based programs, rental assistance is paid for families who live in specific housing developments or units. *See* 24 CFR § 982.1(a), (b).

and Kessler appealed to this Court.[2] Kessler requests that we vacate the trial court's decision and remand for further proceedings. We affirm in part, reverse in part, and remand for further proceedings.

## I. Factual Background

In the early 1970s, Slomowitz, Kessler, and Rosenthal formed three separate Pennsylvania limited partnerships: Hershey Plaza Associates ("Hershey"), Hanover Associates ("Hanover"), and First Valley Associates ("First Valley"). Each partnership owned, operated, and maintained a Section 8 building with apartments for rent by elderly and other low-income residents.

Slomowitz, Kessler, and Rosenthal were Hershey's general partners. Lee Kozol and Urban Properties, Ltd. ("Urban Properties") were the limited partners. *See* Hershey's Amended and Restated Limited Partnership Agreement dated February 1, 1977 ("Hershey Agreement"). During trial, Lee Kozol testified, and the court found, that Lee's brother, Joel Kozol, was another limited partner in Hershey. N.T., at 378; Trial Court's Findings of Fact and Conclusions of Law, at 21, ¶ 91. Hershey owned and operated Hershey Plaza, a 216-unit Section 8 building in Dauphin County.

Hanover's general partners were Slomowitz, Kessler, and Rosenthal. Its limited partners were Mortimer Rosenthal and Marion Terrace, a Georgia

---

[2] Kessler died in July 2019. Subsequently, Kessler's widow, the personal representative of his estate, substituted herself as the defendant in Kessler's place. For the sake of convenience, we will refer to this defendant-appellant as "Kessler."

limited partnership. Hanover owned and operated Marion Terrace, a 200-unit Section 8 building in Luzerne County. *See* Hanover's Amended and Restated Limited Partnership Agreement dated December 7, 1978 ("Hanover Agreement").

First Valley's general partner was Clarmark Associates, a New York joint venture between (1) Slomowitz and (2) Claridge Properties, a partnership consisting of Rosenthal and Kessler. *See* First Valley's Amended and Restated Limited Partnership Agreement dated June 18, 1975 ("First Valley Agreement"). Urban Improvement Fund, Ltd.-1975 ("Urban, Ltd."), a California limited partnership, was First Valley's sole limited partner. *Id.* First Valley owned and operated Daniel J. Flood Tower, a 211-unit Section 8 building in Luzerne County that also contained 17,898 square feet of commercial and professional space.

From the inception of the limited partnerships until Rosenthal's death in 2008, Rosenthal actively managed the partnerships and properties. Kessler served as architect of record on two of the three properties. Following Rosenthal's death, however, Slomowitz and Kessler repeatedly disagreed over management issues. In particular, Kessler contended that there were two general partners, Slomowitz and Kessler, so all decisions relating to the partnerships required both his and Slomowitz's consent. Slomowitz believed that the limited partnership agreements authorized him to make decisions unilaterally.

4

A dispute arose between Slomowitz and Kessler concerning funding from the Pennsylvania Housing Finance Agency ("PHFA"). PHFA established the Preservation Through Smart Rehab Program ("Smart Rehab") to provide capital improvement funding to affordable housing developments, such as the Hanover, First Valley, and Hershey projects, for rehabilitative weatherization improvements. On July 23, 2010, PHFA issued a letter of intent conditionally committing Smart Rehab funding to the Hanover project that both Slomowitz and Kessler accepted on July 27, 2010. PHFA also approved funding for the First Valley project. PHFA set March 1, 2011 as the deadline for closing on the Smart Rehab funding and notified the partnerships that closing was time-sensitive. Slomowitz notified Kessler that he wanted to close on the funding. Kessler advised PHFA that he was not satisfied with PHFA's design, planning, or procedures for the funding projects. PHFA advised Kessler that it had approved everything and that the partnerships would lose the funding if Kessler did not agree.

On February 9, 2011, Slomowitz threatened to commence legal action against Kessler unless Kessler acquiesced in Slomowitz's position on Smart Rehab. On February 22, 2011, Kessler agreed for Slomowitz to assume responsibility for closing on the funding, but at the same time, Kessler repeated his concerns about the funding. Slomowitz thereupon assumed responsibility for closing on the Smart Rehab funding, retained counsel to advise him in his capacity as general partner, and utilized the administrative

services of the property manager and his staff for added oversight. In response, Kessler demanded that Slomowitz retain another attorney with respect to the funding and complained to PHFA about Slomowitz's legal representation. Kessler also claimed that Slomowitz had no unilateral authority beyond personally signing Smart Rehab funding documents and that Slomowitz could not delegate responsibilities relating to Smart Rehab funding without first obtaining Kessler's consent.

On March 16, 2011, Slomowitz commenced the present action seeking declaratory and injunctive relief relating to his authority and rights in connection with the business of the limited partnerships and his activities as a general partner. Subsequently, on August 5, 2011, Slomowitz filed an amended complaint whose prayer for relief included a request for a declaration that he, as general partner of each of the three partnerships, (a) was authorized to take all steps necessary to close on the Smart Rehab program funding without Kessler's consent, (b) was authorized to retain legal counsel in his capacity as general partner in each of the partnerships without obtaining Kessler's consent, (c) was authorized to delegate his responsibilities without Kessler's concurrence, (d) was authorized to act on behalf of the partnerships without the concurrence of Kessler, and (e) was entitled to reimbursement of all costs and expenses in connection with the business of the partnerships, including attorneys' fees. In addition, Slomowitz requested an order enjoining Kessler from interfering with his actions on behalf of the partnerships,

6

together with an award of attorneys' fees and costs to the extent allowable by law. Amended Complaint, Prayer for Relief, at 31-32.

On October 11, 2011, Kessler filed an amended answer, new matter, and counterclaims to the amended complaint. The counterclaims pled breach of fiduciary duty, breach of duty of good faith and fair dealing, and tortious interference with existing and prospective business relations, and sought declaratory relief. In his claim for breach of fiduciary duty, Kessler asserted that each of the partnership agreements required Slomowitz to exercise his responsibilities in a fiduciary capacity, and that Slomowitz breached his duty by making partnership decisions without ever speaking to Kessler. He further alleged that Slomowitz breached his fiduciary duties on the closing of the Smart Rehab and bond funding projects by failing to properly investigate and examine those projects resulting in unspecified damages to Kessler. Amended Answer, Counterclaim, Count I. In his claim for breach of good faith and fair dealing, Kessler alleged that Slomowitz had a duty to act with good faith and fair dealing in his relationship with the partnerships and that he breached those duties by failing to communicate with Kessler regarding partnership matters, by utterly disregarding Kessler's numerous communications and failing to meet with him, and by excluding him from partnership matters. *Id.* at Count II. In his claim for tortious interference with existing and prospective business relations, Kessler alleged that he had substantial experience as an architect, developer, and construction manager of Section 8 program projects,

7

and that the actions of Slomowitz and his agents to portray Kessler as an obstructionist impaired Kessler's relationships with program parties, making them reluctant to conduct business with Kessler. *Id.* at Count III. In his claim for declaratory relief, Kessler alleged that the partnership agreements[3] do not provide for resolution of disputes or differences or disagreements between the general partners, and that there was clear disagreement and deadlock between them regarding operation of the properties. Kessler therefore sought a declaration that because of the deadlock, Slomowitz, in his capacity as general partner in each of the partnerships, could not, without the consultation or concurrence of Kessler, (a) take steps on behalf of the partnerships, (b) utilize counsel of his choice, (c) delegate responsibilities pertaining to the partnerships, and (d) otherwise act on behalf of the partnerships. *Id.* at 43-44. In addition, Kessler sought an order enjoining Slomowitz from unilaterally taking any partnership action without Kessler's consultation or concurrence and enjoining Slomowitz's law firm from acting on behalf of the partnerships pending resolution of the complaints, together with an award of attorneys' fees and costs as allowed by law. *Id.* at p. 44.

While the litigation was pending, between 2014 and 2016, Slomowitz, with the permission of the required number of limited partners and without

---

[3] For convenience, references herein to the "partnership agreements" or "agreements" are to the three limited partnership agreements for Hershey, Hanover, and First Valley.

8

Kessler's consent, sold each of the partnerships' respective buildings. In June 2014, Hershey's apartment complex sold for $15,250,000.00.[4] In July 2015, Hanover's apartment complex sold for $12,100,000.00. In February 2016, First Valley's apartment complex sold for $16,732,000.00. In accordance with the limited partnership agreements, Kessler received in excess of $4 million from the sales of the properties.

On March 9, 2015, Kessler amended his counterclaims to add claims for breach of fiduciary duty with respect to the sale of the Hershey property and the anticipated sale of the Hanover property, a request for an accounting, a claim for breach of duty of good faith and fair dealing, and a request for injunctive relief (1) to require that Slomowitz protect the remaining assets of the Hershey partnership from his unilateral control, (2) to prohibit Slomowitz from unilaterally closing on the Hanover partnership real estate, and (3) to prohibit Slomowitz from taking unilateral action with respect to the First Valley assets. Amended Counterclaims at Counts V-VIII.

In 2017, this case proceeded to a non-jury trial. As noted above, on December 31, 2018, the court entered findings of fact, conclusions of law, and

_____

[4] Prior to the Hershey sale, Kessler filed a petition for a special and preliminary injunction to stop the sale. On February 20, 2014, the trial court dismissed Kessler's petition. Kessler appealed to this Court, which dismissed the appeal on October 14, 2014 because the June 2014 sale rendered the appeal moot.

a decision in favor of Slomowitz on his declaratory judgment action and against Kessler on his counterclaims.

In its discussion of applicable law, the court began with general principles regarding the interpretation and construction of contracts, noting that a contract's meaning must be ascertained from its contents alone when its language is clear and unequivocal. In this regard, the court recognized that parties have the right to make their own contracts, and it is not up to a court to rewrite them or to construe them in conflict with the plain meaning of the language used. Courts use the plain meaning of the contract in order to determine the mutual intent of contracting parties, and the intent of the parties to a contract is regarded as being embodied in the writing itself. Findings of Fact and Conclusions of Law, at 45-47. The court took notice that the Pennsylvania Revised Uniform Limited Partnership Act ("PRULPA") was the law in effect at the time of the creation of the limited partnerships.[5] Citing now-repealed 15 Pa.C.S.A. § 8533(a) of PRULPA,[6] the court held that PRULPA provided that the rights and powers of the general partner of a limited partnership are subject to the limited partnership agreement, and that a written partnership agreement may contain any provision for the regulation

---

[5] The court also recognized that in 2016, the legislature repealed PRULPA effective February 21, 2017. *Id.* at n.4.

[6] The trial court noted this provision is now cited as 15 Pa.C.S.A. § 8642.

of the internal affairs of a limited partnership as agreed to by the partners, whether or not specifically authorized or in contravention of that law. 15 Pa.C.S.A. § 8520(d) (repealed 2016). *Id.* at 48. The court found that Section 7.1 of each limited partnership agreement expressly granted to each of the general partners full, exclusive, and complete right to direct and control the business of each partnership, and that the general partners shall each individually have the authority to execute any checks, documents, agreements, or other instruments. *Id.* at 48-49. The court also found that Section 7.4 in all three partnership agreements provided for indemnification of a general partner against any loss, costs or damages incurred by an act performed by them within the scope of their authority, and that under Section 7.5, general partners are not liable for acting or failing to act within the scope of their authority conferred under the agreements, except where there is gross negligence or intentional misrepresentation.[7] *Id.* at 49-50. With respect to selling all or substantially all partnership assets, the court found that Section 9.1 of the First Valley and Hershey partnership agreements limited this ability without the written consent of *all* limited partners, and that the Hanover agreement prohibited sales without the written consent of 66-2/3 percent in interest of the limited partners. *Id.* at 50. The court rejected Kessler's

---

[7] We observe that in addition, Section 7.5 of the First Valley partnership agreement also excluded "malfeasance" from this non-liability provision.

argument that Section 9.1 of each agreement governed the more general provisions of Section 7.1 to preclude Slomowitz from selling all or substantially all of the partnership's assets. The court held that the uncontested evidence of record demonstrated that no written amendments or agreements were ever made to the agreements and, thus, Slomowitz acted within his powers as general partner. *Id.* at 50-51.

The court ultimately found in favor of Slomowitz on his claim for declaratory relief, concluding that under the language of each limited partnership agreement, Slomowitz, as general partner, acting individually or alone, had full, exclusive, and complete right to direct and control the business of each of the partnerships. *Id.* at 52. Of particular relevance was the court's conclusion that "the conduct of one General Partners [sic], as un-businesslike and offensive as it may be, is not relevant to the application and interpretation of the plain meaning of the contract. To hold otherwise is to negate final expression of their intention at the drafting of the contract." *Id.* at 53. Based upon the language of the partnership agreements, the credible testimony of record and a review of the language of the agreements, the court concluded that Slomowitz acted within his authority as a general partner and, therefore, found in his favor on his request for declaratory relief. *Id.* at 55. Before arriving at this conclusion, the court also found that despite Kessler's repeated contentions that there was a meeting of the minds that all decisions were to be jointly implemented, there was no evidence of record that the terms to

12

work jointly as general partners were ever reduced to writing or signed by the general partners, as required for any amendment to each of the limited partnership agreements. *Id.* at 54-55.

The court next addressed Kessler's counterclaims for breach of fiduciary duties. Consistent with its prior ruling, the court held that "*the evidence of record presented does not support the fact that Slomowitz's failure to communicate with Kessler regarding partnership matters, failure to respond, disregard of emails and correspondence and failure to meet with Kessler are a breach of fiduciary duty despite the fact that the behavior may have been repugnant.*" *Id.* at 55 (emphasis added). The court emphasized (as Slomowitz pointed out in this Court) that there was not any evidence of errors made in the Smart Rehab closing documents or in the procedures utilized for any of the closings or evidence of additional cost, cost overruns, or other damages resulting from any action or inaction by Slomowitz. *Id.* at 56.

The court rejected Kessler's argument that under ***Clement v. Clement,*** 268 A.2d 728 (Pa. 1970), Slomowitz breached his fiduciary duties to Kessler by selling all three properties without prior notice or information to Kessler as to the basis of the sales and selling the properties without his consent. In particular, Kessler argued that as general partners, Slomowitz and Kessler were charged under the partnership agreements with determining whether to seek new financing or to refinance, and to consider all options available to the limited partners. With respect to the Hershey property, Kessler argued that

13

Slomowitz withheld information as to the sales agreement for Hershey Plaza. *Findings of Fact and Conclusions of Law*, at 58. The court found that the record was replete with unanswered emails and phone calls, canceled meetings, and a general disrespect between the general partners. *Id.* Nonetheless, the court rejected Kessler's arguments that Slomowitz was liable for breach of fiduciary duty, citing the text in Section 7.5 of the partnership agreements that a general partner shall not be liable to the partnership or the limited partners for any acts or failures to act within the scope of his authority, except for acts of malfeasance, gross negligence, or intentional misrepresentation.[8] *Id.* The court acknowledged that while there were many issues regarding (1) the closing on the Smart Rehab funds to which Kessler eventually ceded authority, and (2) the lack of sharing of information in the sale of the Hershey property, ultimately the limited partners approved the sale of the Hershey property and it was sold in conjunction with procedures set forth in the limited partnership agreement. *Id.* at 58-59.

The court discussed the sale of the Hershey property in greater detail than the sale of the other properties. Kessler argued that a refinancing of Hershey would have reaped a higher profit. *Id.* at 59. There was no doubt that Slomowitz already had a buyer and sales agreement completed when he

---

[8] The court's reference this time to Section 7.5 included the more inclusive language of "malfeasance" from the First Valley partnership agreement.

was discussing refinancing options with Kessler, and despite multiple opportunities, Slomowitz did not provide this information to Kessler. *Id.* Kessler also argued that Slomowitz engaged in discussions with Linda Rosenthal, the widow of former Hershey general partner John Rosenthal, regarding the Hershey sale. All monies received from the sale of the Hershey, First Valley, and Hanover property interests would go to the John B. Rosenthal Foundation that provides services to the poor and needy. *Id.* at 20, ¶ 85 (citing N.T., at 363).

The court found that Linda Rosenthal contacted Slomowitz in a phone conversation after learning of the Hershey sale from Kessler. *Id.* at 20, ¶ 86 (citing N.T., at 364). During this conversation, she was advised there was a sales agreement and that the property had been on the market for a while. *Id.* She asked that the agreement of sale be sent to her the next day. *Id.* She did not tell Slomowitz she was in full support of the sale of the Hershey property during their telephone conversation, but she did tell him the estate would not be averse to a sale. *Id.* at 20-21, ¶ 87 (citing N.T., at 365, 372–73). Slomowitz did not tell her about a possible refinancing of Hershey Plaza. *Id.* at 21, ¶ 88 (citing N.T., at 365).

Linda further testified to an email dated February 13, 2014 to Slomowitz in which she indicated the estate could not make an informed judgment as to the sale without knowing all the facts, and further attested that the estate was not averse to a sale providing the sales price was consistent with a current

15

appraisal. *Id.* at 21, ¶ 89, (citing N.T., at 368, 370–71, Trial Exhibits T-192, T-330). In response to this email, Slomowitz's attorney contacted Lee Kozol, a Hershey limited partner, and advised him that Linda was in favor of the sale. *Id.* at 59. Counsel never directly spoke to Linda. *Id.* Neither Linda nor John Rosenthal's estate was a limited partner[9] in any of the three partnerships whose consent would have been required for any sale. *Id.* at 60. Lee Kozol testified that Linda Rosenthal's position on the sale of Hershey was important to him. *Id.* The court found that Lee Kozol relied on the representations that all parties were in agreement to the sale and that Linda Rosenthal's support of the sale was significant in his decision to sell the property. *Id.* at 23, ¶ 101 (citing N.T., at 381-83). Kozol's brother Joel was very ill and wanted the sale to occur as soon as possible. Lee Kozol, however, never directly contacted Linda regarding her position on the sale of Hershey and did not learn of a request for an appraisal of the property until after the sale. *Id.* at 24, ¶ 111 (citing N.T., at 399-400). As for Joel Kozol's consent, the court found that while there was no evidence that Joel provided written consent, all parties accepted Lee's representations that he was authorized to act on behalf of his brother while he was gravely ill. *Id.* at 59-61. Finally, in rejecting Kessler's fiduciary duty claims, the court held that Kessler acknowledged there was no

---

[9] Rosenthal's estate succeeded as a general partner to his partnership interests, but was not a limited partner whose consent had to be secured by Slomowitz before selling any of the properties.

written provision requiring a general partner to seek approval of another general partner before acting on behalf of a partnership, and that the agreements did not prohibit Slomowitz from acting on behalf of a partnership. *Id.* at 61. Nor did any of the agreements provide that mutual consent must exist between general partners. *Id.*

The court did not discuss Kessler's damages claim for breach of fiduciary duties because it found no breach by Slomowitz. *Id.* at 63. Kessler claimed that he incurred over $1.2 million in taxes, which he would not otherwise have paid and which could have been avoided had Slomowitz refinanced the properties instead of selling them. Appellant's Brief at.33, n.17. In addition, a refinancing also would have provided Kessler's future estate with a stepped-up basis. *Id.* Kessler points to the trial testimony of Lee Kozol, ignored by the trial court, with respect to the difference between a sale and a refinancing, wherein Kozol testified he understood a refinancing would bring their money tax-free, and that if the net bottom line to him and his brother would have been the same with them retaining their interest in the property, that would have been an attractive situation to him. N.T., at 383-84.

The trial court dismissed the remainder of Kessler's counterclaims. The court denied Kessler's claim for breach of duty of good faith and fair dealing under our Supreme Court's decision in *Hanaway v. Parkesburg Group, LP*, 168 A.3d 146 (Pa. 2017), which held that an implied covenant of good faith and fair dealing will not be implied in a limited partnership agreement created

17

under PURLPA. Findings of Fact and Conclusions of Law, at 63. The court dismissed Kessler's request for an accounting regarding the sale of the three properties based upon the dismissal of his breach of fiduciary duty and breach of duty of good faith and fair dealing claims, and the fact that he received all closing and sales documents and three separate checks as proceeds from these sales. *Id.* Likewise, based upon dismissal of the fiduciary duty and breach of good faith and fair dealing claims, the court dismissed Kessler's claims for declaratory and injunctive relief that requested Slomowitz be enjoined from exercising unilateral control of the properties and disposing of their assets, plus cost of suit and attorneys' fees. *Id.* at 65.

Kessler filed timely post-trial motions seeking *vacatur* of the decision in favor of Slomowitz and an award of compensatory and punitive damages on his counterclaims. In response, and in accordance with the prayer for relief in his amended complaint, Slomowitz requested an award of attorneys' fees. On June 25, 2019, the court denied Kessler's post-trial motions and scheduled a hearing on Slomowitz's request for attorneys' fees. On June 26, 2019, Kessler filed an application for determination of finality under Pa.R.A.P. 341(c). On July 24, 2019, the trial court entered an order declaring the June 25, 2019 order final for purposes of appeal—to the extent it denied Kessler's post-trial motions—but staying Slomowitz's motion for attorney fees pending

18

the outcome of this appeal.[10] On July 25, 2019, Kessler filed a notice of appeal. Both Kessler and the trial court complied with Pa.R.A.P. 1925.

## II. Questions Presented

Kessler raises the following issues for review in this appeal, which we reorder, condense, and restate for the sake of convenience:

> 1. Whether the trial court committed legal error in holding that Slomowitz did not violate his common law and contractual fiduciary duties toward his fellow general partner, Kessler, even when the court found Slomowitz's conduct "un-businesslike and offensive."
>
> 2. Whether the trial court committed legal error by refusing to enforce a certain undisputed verbal agreement between [Slomowitz] and [Kessler], whether as a matter of contract or justifiable reliance, that neither would sell or refinance the properties at issue without the consent of the other, or to consider such evidence as part of [Slomowitz's] breach of fiduciary duty.
>
> 3. Whether the trial court committed legal error by failing to find that the requisite consents of all limited partners to the transactions were not obtained, or in some instances procured by misrepresentations to the limited partners.
>
> 4. Whether the trial court erred by failing to require Slomowitz to provide to Kessler an accounting under 15 Pa.C.S.A. § 8333 or to provide partnership-related information, despite evidence that Slomowitz maintains bank accounts containing certain residual undistributed partnership monies and refuses to permit Kessler to have access to those accounts, or to know where they are located.

---

[10] Slomowitz sought an award of attorney fees as a part of his claims for declaratory relief. Although the trial court did not resolve all claims for declaratory relief, as stated, the trial court amended its order pursuant to Pa.R.A.P. 341(c) to perfect jurisdiction in this Court to hear the present appeal.

5. Whether the trial court committed legal error by refusing to hold that [Kessler], a defendant in [Slomowitz's] declaratory judgment action, was entitled to contractual indemnity for legal fees not tethered to any prevailing party concept under the written partnership agreements.

6. Whether the trial court committed legal error by rejecting all of [Kessler's] underlying claims and therefore erroneously refusing to award [Kessler] any compensatory (actual or nominal) or punitive damages.

7. Whether the trial court committed legal error in determining the case such that [Slomowitz] has declared himself the prevailing party seeking over $600,000 in attorneys' fees, when a correct decision on the merits and under applicable law is and should be that [Kessler] is the prevailing party.

Appellant's Brief at 4-7.

In cases arising from non-jury trial verdicts, our role

is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

***Stephan v. Waldron Electric Heating and Cooling, LLC,*** 100 A.3d 660,

664-65 (Pa. Super. 2014).

## III. Analysis
### 1. The Fiduciary Duty Claims

In the first question presented, Kessler argues that the trial court erred in denying his claim for declaratory judgment because the evidence of Slomowitz's "abhorrent" behavior was overwhelming (Kessler's Brief at 19-37), and as a result, Slomowitz violated his common law and contractual fiduciary duties to his fellow general partner, Kessler (*id.* at 37-49). In particular, Kessler contends that Slomowitz breached Section 7.1 of each agreement by violating his contractual duty to "exercise [his] responsibilities in a fiduciary capacity."

Section 7.1 of all three partnership agreements addresses the powers of general partners. That section provides:

> **7.1 Action by General Partners**
>
> **The General Partners**[11]**, acting individually**[12]**, shall have the authority to make all Partnership decisions and to implement all such decisions by the execution of documents or instruments or by any other action.** No person dealing with any General Partner shall be required to determine its authority or make any commitment or undertaking on behalf of the Partnership, nor to determine any fact or circumstance bearing upon the existence of its authority. In addition, no person, including but not limited to any purchasers of any property or interests owned by the Partnership, shall be required to

---

[11] Section 7.1 of the First Valley partnership agreement refers to the "General Partner" to reflect the fact that First Valley's General Partner was an entity, Clarmark Associates, a New York joint venture between (1) Slomowitz and (2) Claridge Properties, a partnership consisting of Rosenthal and Kessler.

[12] The First Valley partnership agreement refers to "alone." We discern no difference between the use of the terms "individually" and "alone" for purposes of the present discussion.

21

determine the sole and exclusive authority of any General Partner to sign and deliver on behalf of the Partnership any document or instrument, including but not limited to an instrument of transfer of any such property or interest.

**Except as specifically limited herein, each of the General Partners shall have the full, exclusive, and complete right to direct and control the business of the Partnership.** The General Partners or their designees shall each individually have the authority to execute any checks, documents, agreements or other instruments.

(a)  Except as may be inconsistent with the provisions of this Agreement, as it may be amended from time to time, the General Partners shall promptly take any and all actions which may be necessary or appropriate and which are in its power to take, to perfect and maintain the Partnership as a limited partnership under state law, which will be taxable as such by the Federal, State and local governments, and to develop, maintain, and operate the Project in accordance with the provisions of this Agreement, the Regulatory Agreement and applicable Federal, State and local laws and regulations.

**(b)  The General Partners shall at all times exercise their**[13] **responsibilities in a fiduciary capacity,** and in a manner consistent with the provisions of the Regulatory Agreement.

(c)      **The General Partners agree that they shall do all acts, make all elections and take whatever steps are required in the opinion of the Partnership's accountants, to maximize the federal, State and local income tax advantages available to the Partnership, provided that such acts, elections and steps are not inconsistent with subparagraph (b) above and are within the power of the General Partners to take or make.**

---

[13] The First Valley partnership agreement refers to "its."

(Emphasis added.)

We begin with several important observations on the effect of this provision. First, it unequivocally provides that the general partners shall have the authority to make all partnership decisions and implement those by execution of documents or instruments or by any other action. Second, it provides that general partners shall have full, exclusive, and complete right to direct and control the business of the partnership. Third, and critically, Section 7.1(b) provides that general partners shall at all times exercise their responsibilities in a **"fiduciary capacity."** In furtherance of this responsibility, Section 7.1(c) provides that general partners shall do all acts and take whatever steps are required to maximize federal, state, and local income tax advantages available to the partnership. In combination, these provisions give broad and unfettered authority to general partners to conduct the business of the partnership, but at all times, the general partners must do so in a fiduciary capacity keeping in mind the partnership's objective to maximize tax advantages to the partnership.

The limited partnership agreements do not define the term "fiduciary capacity," the standard under which a general partner's conduct must be measured under the limited partnership agreements. We therefore look to applicable law.

The current law governing Pennsylvania limited partnerships, the Pennsylvania Uniform Limited Partnership Act of 2016 ("PULPA"), 15 Pa.C.S.A.

§ 8611 *et. seq.*, applies to all limited partnerships on and after April 1, 2017. 15 Pa.C.S.A. § 8611(c). The limited partnership agreements in this case were created between 1975 and 1978, and all claims asserted by Slomowitz and Kessler relate to events that occurred after Rosenthal's death in 2008 through and including the sale of the last property in February 2016. Consequently, PULPA is not the relevant statute governing the competing claims in this case. Rather, the Pennsylvania Revised Uniform Limited Partnership Act ("PRULPA"), 15 Pa.C.S.A. § 8501 *et. seq.* (repealed), the act in effect at the time these claims accrued, is the governing statute. This is so because when substantive rights are involved, the applicable law is that which is in effect at the time the cause of action arises. ***See Stroback v. Camaioni,*** 674 A.2d 257 (Pa. Super. 1996) (July 1990 amendments to Motor Vehicle Financial Responsibility Law not applicable to motor vehicle accident that occurred in March 1990). This is consistent with the rule of statutory construction that no statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly. 1 Pa.C.S.A. § 1926.

PRULPA does not define the term "fiduciary capacity" or address the fiduciary duties of general partners in a limited partnership. This does not mean that fiduciary duties did not exist under PRULPA, but discerning those duties involves a certain amount of statutory gymnastics.

Section 8533(b) of PRULPA provides that a general partner of a limited partnership has the liabilities of a partner in a partnership without limited

partners to the partnership and to the other partners. 15 Pa.C.S.A. § 8533(b) (repealed). For present purposes, this is a roundabout way of saying that the liabilities of a general partner in a limited partnership are to be treated in the same manner as the liabilities of a partner in a partnership. Complementing this provision is Section 8504 of PRUPLA, which states that in any case not provided for in Chapter 85 (relating to limited partnerships), the provisions of, *inter alia*, Chapter 83 (relating to partnerships) govern. 15 Pa.C.S.A. § 8504 (repealed). Thus, we examine partnership law in effect at the relevant times hereto to determine the fiduciary duties of general partners under a limited partnership agreement.

From 1988 to February 21, 2017, Pennsylvania's statutory law governing partnerships was the Uniform Partnership Act ("UPA"), 15 Pa.C.S.A. § 8301, *et. seq.,* (now repealed).[14] UPA's only provision that mentions a fiduciary duty of a partner is Section 8334, entitled "Partner accountable as fiduciary." Section 8334 provides, *inter alia,* that a partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners. Nothing in this provision indicates that this is meant to define the sole and exclusive fiduciary duty

---

[14] The UPA is essentially a reenactment of prior acts that were in effect from 1915 to 1988. **See** Partnership Act of March 26, 1915, P.L. 18; Act of December 19, 1975, P.L. 524; **see also Canter's Pharmacy, Inc. v. Elizabeth Associates**, 578 A.2d 1326, 1329 n.3 (Pa. Super. 1990).

owed by a partner to a partnership. To the contrary, the UPA also provides that the law of "agency" shall apply to its provisions, 15 Pa.C.S.A. § 8504 (repealed), and that every partner is considered an agent of the partnership for the purpose of its business. 15 Pa.C.S.A. § 8321(a) (repealed). *An agency relationship is a fiduciary one.* **Sutliff v. Sutliff**, 528 A. 2d 1318 (Pa. 1987). *A fiduciary duty is the highest duty implied by law and exists in legal relationships requiring trust and confidence.* **Retina Associates of Greater Philadelphia, Ltd. V. Retinovitreous Associates, Ltd.,** 176 A.3d 263 (Pa. Super. 2017).

Agency law, as applied to partnerships, first appeared in Pennsylvania statutory law when our General Assembly adopted in 1915[15] the Uniform Partnership Act approved in 1914 by the National Conference of Commissioners on Uniform State Laws (the "1914 Uniform Law"). 6 U.L.A. 275 (2001). **See also** Historical and Statutory Notes to 15 Pa.C.S.A. § 8321 (repealed). From 1915 to the present, the incorporation of agency law into Pennsylvania's statutory law on partnerships and limited partnerships has had a long and unbroken history. **See** Section 8431 of the Pennsylvania Uniform Partnership Act of 2016 ("PUPA"), 15 Pa.C.S.A. § 8431 (each partner is an agent of the partnership for the purpose of its business) and Section 8642 of

---

[15] The Act of 1915, March 26, P.L. 18.

PRULPA, 15 Pa.C.S.A. § 8642 (general partner as agent of a limited partnership). This express incorporation of agency law into partnership law recognizes that at common law, a general partner was considered an agent of the partnership.[16] **See** Committee Comment-2016, Subdivision (a) to Section 8642. This history also informs us as to the fiduciary duties of partners.

In 1915, when the 1914 Uniform Law was adopted, the common law fiduciary duties of agents to their principals already was well developed.[17] Those duties included (a) a duty of loyalty, (b) a duty of care, (c) a duty to act in good faith and fair dealing, and (d) a duty to disclose material information.[18] As one commentator has observed, "The law of agency

---

[16] The term "agent" has a settled meaning under common law: an agent is a fiduciary of the principal and thus has a duty of loyalty to act only for the principal's benefit and with the utmost good faith. **See Sutliff**, 528 A.2d at 1323 ("An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit"); **Garbish v. Malvern Federal Sav. & Loan Ass'n**, 517 A.2d 547, 553-54 (Pa. Super. 1987) ("Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal. . . . This duty is the same as that of a fiduciary which has been described as the duty to act for the benefit of another as to matters within the scope of the relation").

[17] **See** Mark J. Loewenstein, *Fiduciary Duties and Unincorporated Business Entities: In Defense of the Manifestly Unreasonable Standard,* 41 Tulsa L. Rev. 411 (2013).

[18] **Id.** at 417. **See also** Restatement (Second) Agency, § 13 (agent is a fiduciary), § 379 (duty of care and skill), § 381 (duty to give information), § 387 (duty of loyalty), § 390 (acting as adverse party, duty of fair dealing). *(Footnote Continued Next Page)*

contains an elaborate treatment of fiduciary duties based upon the trust a principal places in its agent, who acts on the principal's behalf."[19]  In fact, the Restatement (Second) of Agency devotes over twenty sections to the topic that covers more than eighty pages with numerous illustrations of the fiduciary principle at work.[20]

Against this early background of applying agency principles to partnerships is the bellwether 1928 case of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (N.Y. 1928).  In that case, the two individuals that comprised a joint venture, Meinhard and Salmon, executed a twenty-year lease for a New York City property to convert it from a hotel to shops and offices.  It was agreed that the two were co-adventurers subject to fiduciary duties akin to those of partners.  Near the expiration of the leasehold, Salmon learned that the owner of the reversion interest in the property, who also owned adjoining properties, had plans to lease the entire tract for a long term

_____

The fiduciary duty to act in good faith and fair dealing should not be confused with the implied duty of good faith and fair dealing in contracts. ***See*** Restatement (Second) of Contracts, § 205; ***Hanaway v. Parkesburg Group, LP,*** 132 A.3d 461, 472-73 (Pa. Super. 2015), *rev'd on other grounds,* 168 A.3d 146 (Pa. 2017); ***Ash v. Continental Ins. Co.,*** 932 A.2d 877 (Pa. 2007) (explaining difference between contractual duty of good faith and fair dealing and breach of fiduciary duty in tort under insurance bad faith claims).

[19] J. Dennis Hynes, *Freedom of Contract, Fiduciary Duties, and Partnerships: The Bargain Principle and the Law of Agency,* 54 Wash. & Lee L. Rev. 439, 445 (1997).

[20] ***Id***.

to someone who would destroy the buildings then existing and erect another in their place. The owner approached Salmon, and a new lease for the entire tract was executed with the Midpoint Realty Company, which was owned and controlled by Salmon. This opportunity was not disclosed to Meinhard, who first learned of it after the new lease was an accomplished fact. Salmon would not have been privy to this new opportunity but for his involvement in the joint venture with Meinhard. Meinhard sued for breach of the joint venture agreement, and the trial court held that under the joint venture agreement, Salmon held the leasehold as a fiduciary for another. Under these facts, the court charged him with a duty of unselfish and undivided loyalty and disclosure. In affirming judgment in favor of Meinhard, then-Chief Justice Cardozo of the New York State Court of Appeals provided one of the most oft-cited descriptions embodying the essential nature of the fiduciary relationship between partners:

> Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. **Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.** As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

29

*Id.* at 249 N.Y. at 463-464, 164 N.E. at 546 (emphasis added). This description has been followed and cited by our own Supreme Court, **see Clement, supra**, and is a reflection of the continued vitality of that statement and the high standard of conduct underlying the fiduciary duties partners owe each to the other. Notably, Cardozo's description of a fiduciary relationship in **Meinhard** did not rest upon any statutory or contractual provision but appears to be grounded in the relationship of trust between partners. This description of the essence of a fiduciary relationship remains the benchmark against which the fiduciary duties of partners are to be measured; the duty of the finest loyalty, the punctilio of honor the most sensitive. This description sets the tenor of the fiduciary duties of partners to one another when examining whether conduct comports with a fiduciary standard, the highest duty implied in law. **Retina, supra**.

As previously noted, Section 7.1 to the limited partnership agreements provides that the general partner(s) shall act in a "fiduciary capacity," and in particular, shall act consistent with this standard to maximize the federal, State, and local tax advantages to the partnership. Contractually imposing a fiduciary standard upon the obligation to maximize tax advantages under the Hershey, Hanover, and First Valley partnership agreements, was permissible under PRULPA. PRULPA provides for freedom of contract to allow for a partnership agreement to contain any provision for the regulation of the

30

internal affairs of the limited partnership. 15 Pa.C.S.A. § 8520(d) (repealed). Section 7.1 is one such example.[21]

As applied to the present case, our analysis of pertinent authorities establishes that the fiduciary duties of the general partners under the three limited partnership agreements are a combination of duties (1) statutorily provided for under PRULPA, (2) contractually defined or limited by the parties under the agreements, and (3) existing at common law by application of agency principles, i.e., the duty of loyalty, care, good faith and fair dealing, and the duty to disclose.[22]

_____

[21] The freedom to contract to regulate the internal affairs of a limited partnership has been carried forth in today's PULPA. PULPA is more detailed in addressing the ability of partners to contractually provide for or restrict in a limited partnership agreement the scope of a partner's duties, with some exceptions. *See* 15 Pa.C.S.A. § 8615. This reflects a current trend to permit parties greater freedom to contractually alter the duties of partners in their limited partnership agreements. To this end, while Section 8615(c) of PULPA, provides that a limited partnership agreement may not *eliminate* the duty of loyalty or care, or vary the contractual obligation of good faith and fair dealing, 15 Pa.C.S.A. §8615(c), the agreement may *alter* the duty of loyalty or care, or alter or eliminate any other fiduciary duty, if not "manifestly unreasonable." 15 Pa. C.S.A. § 8615(d)(3). Nonetheless, while current law reflects greater freedom of contract to alter a general partner's duties, current law still provides for the application of agency principles to the performance of a partner's activities and affairs on behalf of a limited partnership. 15 Pa.C.S.A. § 8642. The history of our partnership statutes does not reflect a narrowing of a partner's fiduciary duties, but rather the preservation of them subject to contractual modification.

[22] In defining standards of conduct for general partners in a limited partnership, PULPA, for the first time, expressly treats only the duty of loyalty as a fiduciary duty, separately identifies the duty of care, and refers to the
*(Footnote Continued Next Page)*

Accordingly, to examine Kessler's breach of fiduciary duty claims we first look to the limited partnership agreements. Section 7.1 of the Hershey, Hanover, and First Valley limited partnership agreements contractually impose a fiduciary standard upon the general partners to do all acts and take whatever steps are required consistent with that standard to maximize tax advantages to the partnership. By incorporation of agency law under PRULPA, as made applicable to the agreements, a general partner under any of the three agreements is obligated to conduct his actions consistent with the duties of loyalty and care, to act in good faith and fair dealing[23] with co-partners, and

_____

duty of good faith and fair dealing as a contractual obligation. 15 Pa.C.S.A. § 8649. Comments to Section 8649 explain that not referring to the duty of care as a fiduciary duty is mere semantics and not a change in existing law, but was done so because the duty of care applies as well to many non-fiduciary situations. **See** Committee Comment-2016 to Section 8649, Subsection (c). As for the obligation of good faith and fair dealing, the comments emphatically state that the obligation is a contractual duty, not a fiduciary duty, and is meant to protect the arrangement the general partners have chosen for themselves. **Id.** at Subdivision (d). It is beyond the purview of this opinion to explore the reconciliation between these provisions and PULPA's continued incorporation of agency law as that applies to a general partner of a limited partnership.

[23] We are cognizant of our Supreme Court's decision in **Hanaway, supra**, that held an implied covenant of good faith and fair dealing will not be implied in a limited partnership agreement created under PURLPA. We do not view our conclusion that a duty of good faith and fair dealing has been recognized as a fiduciary duty of partners under common law agency principles as inconsistent with **Hanaway**. **Hanaway** dealt only with the issue of whether there was an implied *contractual* covenant of good faith and fair dealing in that limited partnership agreement. It did not address that obligation as a fiduciary duty,
*(Footnote Continued Next Page)*

32

to disclose to co-partners information material to the conduct of the partnership's business. As co-partners, these are fiduciary duties that Slomowitz and Kessler owe to one another.[24]

The trial court, in dismissing Kessler's fiduciary duty claims and granting judgment in Slomowitz's favor, focused almost exclusively on those parts of Section 7.1 of the partnership agreements granting a general partner the authority to make all partnership decisions, to execute all documents and instruments to implement those decisions, and the right to have the full, exclusive, and complete right to directly control the business of the partnership. *See* Findings of Fact and Conclusions of Law, at 52-53. The court, however, ignored and provided no discussion regarding how a general partner's fiduciary duties may affect actions to be performed on behalf of the

---

since the statute of limitations on breach of fiduciary duty had expired in that case.

[24] We recognize that under the First Valley limited partnership agreement, the general partners were Clarmark Associates, a New York joint venture between Slomowitz and Claridge properties—a partnership consisting of Rosenthal and Kessler. For sake of convenience, we refer to Slomowitz and Kessler as co-partners in First Valley, since joint venturers are considered the same as general partners when considering the fiduciary duties owed one to the other. *Clement*, 260 A.2d at 729 (citing *Meinhard*). We do so without offering any opinion on the status of the Claridge properties partnership between Rosenthal and Kessler, because at all relevant times hereto, Rosenthal already was deceased. We have proceeded on the assumption that Kessler was the surviving and sole general partner of Claridge as the parties and court seem to have done. We likewise offer no opinion on New York law as that may affect the status of that partnership or on the Claridge properties partnership agreement itself, since the matter of that document is not before this Court.

33

partnership. Instead, the court held that the conduct of a general partner, as un-businesslike and offensive as it may be, was not relevant to the application and interpretation of the plain meaning of the partnership contract. *Id.* at 53. This was error, since the performance of any actions by a general partner under the partnership agreements is to be performed in a "fiduciary capacity," and, in particular, with a goal to maximize tax advantages. Acting in a fiduciary capacity required Slomowitz to act, *inter alia,* loyally, with care, with good faith and fair dealing, and to disclose material information to co-partners. Not honesty alone was satisfactory; Slomowitz had the duty to act with the punctilio of an honor the most sensitive as the standard of behavior. **Clement** (citing **Meinhard**). The court's finding that Slomowitz acted in an un-businesslike and offensive manner, and that he ignored and did not communicate with Kessler on the sale of the properties cannot be reconciled with the fiduciary duties Slomowitz owed Kessler as a co-general partner under the partnership agreements.

Accepting the trial court's findings of fact supported by competent evidence and considering the evidence in a light most favorable to the verdict winner Slomowitz, we nonetheless conclude that Slomowitz breached the fiduciary duties he owed to Kessler as a co-partner in each of the three limited partnerships.

**A. The Hershey Sale**

In 2013, following Slomowitz's commencement of this case and Kessler's initial answer and counterclaims, PHFA developed a $9.5 million refinancing proposal for Hershey that included $1 million for property repairs and reduced interest from a fixed rate of 8.78% to a fixed rate of 3.95%. Findings of Fact and Conclusions of Law, at 19, ¶ 73. Brian Shull of PHFA presented the refinancing in separate meetings with Kessler, who enthusiastically approved the idea. In July 2013, Kessler telephoned Slomowitz to recommend refinancing, and Slomowitz told Kessler, "I'll get back to you." *Id.* at 19, ¶¶ 78-79 (citing N.T., at 133, 315; exhibit T-163). This was misleading; Slomowitz actually had been shopping the Hershey building for sale and already had obtained a signed sales agreement for the Hershey building in June 2013. *Id.* at 19, ¶ 77. Despite multiple opportunities to do so, Slomowitz did not provide this information to Kessler. *Id.* at 59. This deception by Slomowitz alone was a breach of his fiduciary duties of loyalty, good faith and fair dealing, and the duty to provide full disclosure of material facts to Kessler. This breach further was exacerbated when Slomowitz, heeding the advice of Urban Properties, a limited partner, did not share this information with Kessler because he felt Kessler would attempt to stop the sale. *Id.* at 20, ¶ 82. Slomowitz, as a general partner, owed a duty to Kessler, his co-general partner, to discuss and disclose candidly and in a timely manner the details of the sale and to consider Kessler's concerns.

35

Rosenthal was a general partner in all three limited partnerships. Upon his death, his estate was entitled to the value of his interests in those partnerships. *See* 15 Pa.C.S.A. § 8364 (repealed). His widow, Linda Rosenthal, was the executrix of his estate. *Id.* at 20, ¶ 84. All monies received from the sale of the three partnership properties to be paid to Rosenthal's estate were to go to the John B. Rosenthal Foundation that provides services to the poor and needy. *Id.* at 20, ¶ 85. Linda testified she contacted Slomowitz after learning of the Hershey sale from Kessler. *Id.* at 20, ¶ 86. During that telephone conversation she was advised there was a sales agreement and that the property had been on the market for a while. *Id.* She asked that the agreement of sale be sent to her the next day. *Id.* She testified she did not tell Slomowitz she was in full support of the sale during their conversation on January 30, 2014, but did tell him the estate would not be averse to a sale. *Id.* at 20-21, ¶ 87. During that telephone conversation, however, she was not made aware of possible refinancing of the Hershey property. *Id.* at 21, ¶ 88. She further testified to a February 13, 2014 email to Slomowitz wherein she indicated the estate could not make an informed judgment as to the sale without knowing all facts and that the estate was not averse to a sale providing the sales price was consistent with a current appraisal. *Id.* at 21, ¶ 89. There is no indication in the record that Slomowitz ever requested or received a current appraisal of the property.

36

Lee and Joel Kozol were limited partners in Hershey. Slomowitz, as a general partner, could not sell the Hershey property without the consent of all the Hershey limited partners. Hershey Agreement at 9.1(c). At the time of the Hershey sale, Lee was authorized to speak on behalf of his brother Joel before he passed away. Findings of Fact and Conclusions of Law, at 21, ¶ 94. In October 2013, Lee was informed through correspondence from Slomowitz that Hershey was under an agreement of sale. *Id.* at 21, ¶ 95. Lee thereafter received an email from Slomowitz's counsel, Eugene Roth, dated January 30, 2014, concerning an injunction filed by Kessler regarding the Hershey sale, wherein Roth referenced a telephone call with Linda and the fact that Linda was in full support of the sale. *Id.* at 22, ¶ 96. Roth never directly spoke to Linda, but only relayed information he received, as he was under the assumption Linda had no interest in stopping the sale of the Hershey property. *Id.* at 22, ¶ 97. Lee further testified that he relied upon the representations that all parties were in agreement to the sale and that Linda's support of the sale was significant in his decision to sell the property. *Id.* at 23, ¶ 101. Lee did acknowledge that he had a conflict with Kessler, as Kessler was opposed to the sale while Lee was in favor of it. *Id.* at 23, ¶ 106. Lee never directly contacted Linda regarding her position on the Hershey sale and did not learn of her request for an appraisal until after the sale. *Id.* at 24, ¶ 111. Lee later testified at trial that he would have been interested in refinancing because

37

while the net bottom line remained the same, "refinancing would bring our money tax free." N.T., at 383.

The trial court dismissed any impact Linda's opinion of the sale may have had on Lee Kozol because she, and hence Rosenthal's estate, were not limited partners and would not have had a direct vote on the property sale. Findings of Fact and Conclusions of Law, at 60-61. The court further found that while there was a lack of information sharing on the sale of the Hershey property and that Slomowitz, on multiple occasions had opportunities to provide this information to Kessler, there was no breach of fiduciary duty because the limited partners did in fact approve the sale and the property was sold in conjunction with procedures set forth in the partnership agreement. *Id.* at 58-59. Once again, the court made these findings and came to its conclusion there was no breach of fiduciary duty without considering the nature or extent of the fiduciary duties Slomowitz owed to Kessler under the partnership agreement. This was error. Slomowitz was obligated to deal with the partnership honestly and to provide truthful and material information in a timely manner to its members. And while it is true, as the court found, that Rosenthal's estate was not a limited partner whose consent was necessary for the sale, it ignores the fact that Lee Kozol's consent was secured without Slomowitz providing full and accurate information regarding Linda's concerns regarding the sale and request for additional information. This lack of candor and honesty not only may have affected Lee's decision to agree to the sale,

but also it directly impacted Kessler's interest in the property once the consent of the limited partners was secured.

Likewise, the court erred in its conclusion that Slomowitz breached no fiduciary duty despite its findings that (1) Slomowitz failed to communicate with Kessler regarding partnership matters, (2) failed to respond to Kessler, (3) disregarded emails and correspondence, and (4) failed to meet with Kessler, actions that the court characterized as merely un-businesslike or offensive. Findings of Fact and Conclusions of Law at 53, 55. Slomowitz owed Kessler a duty of loyalty, a duty of disclosure, and a duty of good faith and fair dealing.

The trial court also erred by not considering at all the express duty under the partnership agreement that Slomowitz, acting in a fiduciary capacity, was to maximize tax advantages to the partnership. Slomowitz sold all three properties instead of refinancing. Kessler claimed he incurred over $1.2 million in taxes that he would not have otherwise paid. The court made no findings on any loss, since it found no breach. Had the properties simply been refinanced, there would have been no tax, and Kessler's future estate would have been provided a stepped-up basis. N.T., at 166-67 (Kessler); N.T., at 472 (CPA Duffus); N.T., at 600-01, 614-19, 623-25 (CPA Lazor). Slomowitz's expert, CPA Lazor, was never asked to analyze the respective benefits of

39

refinancing and sale before any of the properties sold.[25]  Lazor agreed that (1) it was possible a refinancing would have benefited Kessler more than a sale, (2) had Kessler died while the properties were still owned, his estate would have succeeded to the IRS Section 754 stepped-up basis, and (3) tax planning teaches clients how to pass their assets to their heirs with a stepped-up basis. N.T., at 600-01, 614-19, 623-25.  To demonstrate these points, he testified that Rosenthal's death just before the sale of the Hershey building provided his estate with a stepped-up basis, but on the other hand, Lee Kozol paid income tax on his share of the gain that was recognized.  *Id.*

We acknowledge that had Slomowitz acted in a manner that comported with his fiduciary duties to Kessler and the limited partners, an end result may still have been disagreement amongst them as to whether the properties should be sold or refinanced. Slomowitz's actions, however, to resolve or force the result he desired by disregarding his fiduciary duties breached his contractual obligations under the partnership agreements. When faced with the impasse that occurred here, it was incumbent upon Slomowitz to attempt to resolve the matters consistent with him acting in a fiduciary capacity and,

---

[25] Nor was Lazor shown PHFA's refinancing proposal as part of his expert testimony review.

failing that, possibly seek remedies available at law or equity.[26]  Under no event, as discussed, could Slomowitz fulfill his fiduciary duties by ignoring the legitimate financial concerns of Kessler, a co-equal partner, who could be significantly adversely affected by Slomowitz's unilateral decisions.

In summary, construed in the light most favorable to Slomowitz, the evidence nonetheless makes clear that he breached his contractual fiduciary duties to Kessler in multiple respects.  When Kessler called Slomowitz and recommended refinancing, Slomowitz breached his fiduciary duties to Kessler by replying, "I'll get back to you," thereby concealing the fact that he already obtained an agreement to sell the Hershey building.  **See eToll, Inc. v. Elias/Savion Advertising, Inc.**, 811 A.2d 10 (Pa. Super. 2002) (agent has duty to disclose all relevant information to a principal).  Slomowitz breached his fiduciary duties to Kozol and the partnership in the course of obtaining the consent of the Kozols, two of Hershey's three limited partners, to the sale of the Hershey property.  Through his attorney, Slomowitz deceived the Kozols into agreeing to sell the Hershey building by misrepresenting to Lee Kozol that Rosenthal's widow approved the sale, a detail that the Kozols considered

---

[26] With sufficient foresight, it was possible for the partnerships to provide for a mechanism to resolve an impasse through internal regulation under the partnership agreements.  Other possible remedies that might not have violated fiduciary duties may have included court intervention.  **See** 15 Pa.C.S.A. § 8681(6)(ii) (application to dissolve where it is not reasonably possible to carry on partnership activities in conformity with the partnership agreement), and § 8691 (direct action by partner).

material. By employing deceit in his dealings with the Kozols, Slomowitz breached his fiduciary duties to the partnership. The same deceitful conduct violated Slomowitz's fiduciary duties to Kessler because it facilitated the very act that Slomowitz knew Kessler opposed, the sale of the Hershey building. Finally, Slomowitz breached his fiduciary duty to Kessler under Section 7.1(c) without considering the tax effects of selling the Hershey building instead of maximizing tax advantages through refinancing. This is not to say that a sale by Slomowitz always would violate his fiduciary duty to maximize tax advantages. We hold only that under the circumstances here that Slomowitz breached his fiduciary duties to Kessler where Slomowitz did not even engage in any discussion with Kessler or obtain other necessary information to assess the effect a sale would have on Kessler or the partnership.

### B. Hanover and First Valley

The court found that the limited partners of Hanover and First Valley approved the sale of their properties, Marion Terrace and the Daniel J. Flood Towers, respectively. Findings of Fact and Conclusions of Law, at 27, ¶ 130; *id.* at 29, ¶ 140. Marion Terrace was sold in July, 2015 for $12,100,000 and the Daniel J. Flood Towers was sold in February 2016, for the sum of $16,732,000. *Id.* at 27, ¶ 132; *id.* at 29, ¶ 144. The trial court made no express findings regarding whether the manner in which these sales were accomplished comported with the fiduciary duties Slomowitz to Kessler. In particular, the court made no findings as to whether Slomowitz exercised his

42

fiduciary duties to maximize the tax advantages from these properties as he was required to do under Section 7.1(c) of the partnership agreements. Like the sale of the Hershey property, the court found it sufficient that Slomowitz had the authority to act on behalf of the partnerships and that partnership procedures were followed to close on the sales. *Id.* at 48-50, 52. As stated previously, the court did state that with respect to all properties, the evidence of record presented did not support the fact that Slomowitz's failure to communicate with Kessler regarding partnership matters, failure to respond, disregard of emails and correspondence, and failure to meet with Kessler were a breach of fiduciary duty despite the fact that the behavior may have been repugnant. *Id.* at 55. To the extent the court dismissed these failures by Slomowitz as not breaching his fiduciary duties to Kessler with respect to the sale of the Hanover and First Valley properties, that conclusion was error for the same reasons previously discussed with respect to the sale of the Hershey property.

### C.    Other Fiduciary Issues

We add two additional observations respecting Slomowitz's breach of fiduciary duties. First, while it is true that the consent of the limited partners was required before a general partner could sell any of the properties, that fact did not excuse Slomowitz's failure to satisfy the fiduciary duties owed to his co-partner, Kessler. Slomowitz had an independent obligation to act in a fiduciary capacity with respect to Kessler's interest in the partnership

43

properties. Second, we reject Slomowitz's suggestion that because he did not possess information such as appraisals, tax analysis, expenses to be paid, and consideration of alternatives other than sale of the properties, he did not breach a fiduciary duty to obtain this information in the first place, since if the information had not been obtained it could not be provided to Kessler. Appellee's Brief at 35-36. This argument misses the point. In order to fulfill his fiduciary duty to act in the best interests of the partnership and to Kessler, Slomowitz was required to investigate these types of information before he decided upon the sale of the properties. Slomowitz sold approximately $44 million worth of properties. These were significant matters that directly affected the partnership and its members. In fact, the sale of these properties operated as a dissolution of the partnerships. *See* Section 13.1(f) to the partnership agreements.

### D. The Exculpatory Provision; Section 7.5

Our conclusion that Slomowitz breached his fiduciary duties to Kessler in the manner in which he sold the three partnership properties does not end our inquiry as to whether Kessler is entitled to relief. In its decision, the trial court referred to Section 7.5 of the partnership agreements, the full text of which provides as follows:

> The General Partners shall not be liable, responsible, or accountable in damages or otherwise to the Partnership or to the Limited Partners for the doing of any act or the failure to do any act, the effective which may cause or result in any loss or damage to the Partners or Partnership, if the General Partners were within

the scope of the authority conferred on them by this Agreement, **except for acts of gross negligence, or intentional misrepresentation**.

Findings of Fact and Conclusions of Law, at 58 (emphasis added). As noted previously, the First Valley agreement also adds "malfeasance" to the acts that may result in liability to the partners or partnership. The court cited this provision in support of its conclusion that the record did not evidence any facts that errors were made in the procedures utilized in the sale of the properties. *Id.* We already have addressed that contention, but this provision raises the additional question whether Slomowitz's breach of fiduciary duties constituted any acts of gross negligence or intentional misrepresentation under the Hershey and Hanover agreements, or malfeasance, gross negligence, or intentional misrepresentation under the First Valley agreement. If not, then it may be arguable this provision could exonerate Slomowitz from breaches of his fiduciary duties. Since the court did not find any fiduciary breach by Slomowitz, neither the court nor the parties have briefed the effect of this provision on any liability that Slomowitz may have to Kessler for breach of fiduciary duty. This is a question that may be addressed and resolved on remand.

### E. Relief as to the Fiduciary Claims

In light of our conclusions that Slomowitz breached his fiduciary duties to Kessler with respect to the sale of the three properties, we reverse the trial court's conclusions in this regard. We find we also must order a remand for

45

J-A03043-20

the trial court to make additional findings of fact, whether by admitting additional evidence or by reliance upon the existing record, as to Slomowitz's additional breaches, if any, with respect to his disregard to consider maximizing tax advantages to the partnerships when he made the decision to sell the properties. The court did not address this particular fiduciary duty in its findings. A remand also is necessary to the extent the parties or the court determine that additional findings are necessary to address the effect of Section 7.5 of the agreements. If the conclusion remains that Slomowitz is liable to Kessler for breach of fiduciary duties on any one or all of the properties after consideration of Section 7.5, then the court must proceed to consider Kessler's claims for damages which it did not do in the first instance, proof of which Kessler bears the burden of proof. **See Snyder v. Crusader Serving Corporation**, 231 A.3d 20, 31 (Pa. Super. 2020).

## 2. The Verbal Agreement

In his second question presented, Kessler maintains the trial court erred in not finding that, after the passing of Rosenthal, Kessler and Slomowitz reached an agreement as to how to move forward in light of Rosenthal's death. Kessler maintains they agreed that all decisions regarding the limited partnerships would be by joint consent of the two of them. In its decision, the court noted that there was a significant amount of testimony dedicated to this issue. Despite Kessler's contentions, the trial court found that an agreement was never reached between Kessler and Slomowitz to work jointly as a team

and, further, this understanding was never reduced to a written amendment to any of the partnership agreements, which would have required the written approval of the limited partners pursuant to Section 9.1(b). Findings of Fact and Conclusions of Law, at 44, ¶¶ 155-156. Under our applicable standard of review where we must defer to the findings of the trial court if supported by competent record evidence, **Stephan, supra**, we conclude that the trial court's findings have proper record support and therefore, we are not free to disregard them. This issue has no merit.

### 3. Consent of the Limited Partners

In his third issue, Kessler challenges the court's findings that the requisite number of limited partner consents was secured by Slomowitz prior to the sale of the Hershey and First Valley properties. Section 9.1(c) to both the Hershey and First Valley partnership agreements provides that the general partner may not, without the written consent of the limited partners in Hershey and the limited partner in First Valley, sell all or substantially all of the partnerships assets.

Kessler's challenge is twofold as to Hershey. First, he maintains there is no evidence Joel Kozol or his estate provided written consent to the sale of Hershey or written authority to Lee, his brother, to act on his behalf. Second, he maintains Joel's estate never agreed to an amendment requested by First Valley's limited partner to extend the closing date on the Hershey sale. The trial court found that at the time of the sale of the Hershey property, Lee was

47

authorized to speak on behalf of Joel before he passed away. Findings of Fact and Conclusions of Law, at 21, ¶ 94. The court also found that on February 7, 2014, Lee sent an email to Slomowitz's counsel indicating that "on behalf of my brother Joel A. Kozol and myself, who together own [a] 5% limited partnership interest originally allocated to me in Hershey Plaza Associates . . . this will confirm our consent to the sale of the partnerships assets . . . for $15,250,000[.]" *Id.* at 24, ¶ 108. Upon review of the record, we find that there is competent evidence to support these findings by the trial court. Moreover, Kessler has not cited any authority that would have prohibited Lee from providing written consent on behalf of his brother who was gravely ill at the time. We also find no support for Kessler's contention that the consents provided by Lee were rendered ineffective because Urban Properties consented to the sale occurring at a later date. All that Section 9.1 of the Hershey agreement required was that consent be given to sell the asset.

With respect to the First Valley sale, Kessler maintains that the limited partner in that entity was "Urban Improvement Fund Limited-1975" and not "Urban Improvement Fund Limited 1975, LP" that approved the sale. He contends that the former entity, named as the limited partner in the First Valley agreement, merged into "Urban Improvement Fund Limited 1975, LP" and that the court erred in concluding that the limited partner to First Valley approved the sale. Other than pointing out this factual discrepancy, Kessler cites no authority or other record evidence in support of this argument. We

48

would expect that to successfully press this argument some analysis would be set forth regarding the effect of the merger and whether or not the resulting entity succeeded to the rights and liabilities of the acquired entity. It is not the function of this Court to develop an argument for a litigant, nor can we be expected to scour the record to find evidence to support an argument. Accordingly, we must deem this argument waived. **See** Pa.R.A.P. 2119(a), **Commonwealth v. Beshore**, 916 A.2d 1128 (Pa. Super. 2007).

### 4. The Right to an Accounting and to Partnership Information

In his amended counterclaims, Kessler sought an accounting for all the Hershey, Hanover, and First Valley assets. Amended Counterclaims, Count VI. The counterclaim is not specific as to the authority for this cause of action, but in his brief Kessler argues he was entitled to relief under Pa.R.C.P. No. 1021. Kessler argues that the court erred in ignoring evidence that (1) Slomowitz maintained bank accounts containing residual undistributed partnership monies, but refused to permit Kessler to have access to those accounts or to know where they were located, (2) there was evidence the partnerships were not all dissolved, (3) he was denied an accounting for attorneys' fees paid out from the partnerships, (4) settlement sheets from the sales show various escrow accounts under Slomowitz's sole control to Kessler's exclusion, and (5) discrepancies existed between the distribution sheets and tax returns as to the amounts of attorneys' fees paid on the Hershey sale. In its decision, the trial court summarily dismissed the

accounting claim upon the basis that Kessler, as a general partner, already received all closing and sales documents and three separate checks as his proceeds from the sales, which he deposited. The court further concluded that no relief was in order, since it dismissed Kessler's other counterclaims. We conclude the court erred in not giving full effect to Kessler's counterclaim for an accounting and for partnership information.

Pa.R.C.P. 1021 is a rule governing claims for relief that permits pleading alternative demands for relief, including an accounting. The rule in and of itself does not establish a right to an accounting. The right to an accounting must derive from another source. *See Buczek v. First National Bank of Mifflintown,* 531 A.2d 1132 (Pa. Super. 1987) (the right to relief in the form of an accounting pursuant to Rule 1021 is merely incident to a proper assumpsit claim). Section 8335 of the UPA, 15 Pa.C.S.A. § 8335 (repealed)[27], as made applicable to limited partnerships, 15 Pa.C.S.A. § 8504 (now repealed), provides:

**§ 8335.  Right of partner to an account.**

Any partner shall have the right to a formal account as to the partnership affairs:

(1)  If he is wrongfully excluded from the partnership business or possession of its property by his copartners.
(2)  If the right exists under the terms of any agreement.

---

[27] Section 8448 of PUPA, 15 Pa.C.S.A. § 8448, preserves a partner's right to an accounting.

(3) As provided by section 8334 (relating to partner accountable as fiduciary).
(4) Whenever other circumstances render it just and reasonable.

Kessler's right to inspect partnership books is statutory, is independent of any pending cause of action, not dependent upon what eventually will be shown by the account, and exists regardless of whether the account will show that he is entitled to any additional funds. ***Ignelzi v. Ogg, Cordes, Murphy and Ignelzi,*** 78 A. 3d 1111 (Pa. Super. 2013). The trial court therefore was in error by denying Kessler's right to an accounting upon the basis it found no merit to his underlying counterclaims and/or that he already received some financial information. We further note that the fact the partnership properties were sold and the partnerships terminated does not render moot Kessler's claim for an accounting. The dissolution of a limited partnership does not eliminate or impair any remedy available to or against the limited partnership or its partners for any right or claim existing, or liability incurred, prior to dissolution. 15 Pa.C.S.A. § 8575 (repealed).

To the extent Kessler asserts a contractual claim to records of the partnerships, we note that Section 14.1 of the partnership agreements provides that the general partners shall at all times keep and maintain complete and accurate books, records and accounts of the partnership. These documents are to be kept in the office of the general partner and all partners and their duly authorized representatives shall at their own expense have the

right to audit, examine, and make copies of those documents during normal business hours. *See* Section 14.1(a) and (b) to Hershey, Hanover, and First Valley partnership agreements.

The UPA likewise, as Kessler argues, provides a statutory right to partnership information. As made applicable to limited partnerships, Section 8333 of the UPA, 15 Pa.C.S.A. § 8333 (repealed), provides:

> Partners shall render on-demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability.

Kessler therefore possessed both statutory and contractual rights to partnership information. We accordingly reverse the trial court's order denying Kessler's claim for an accounting and for related partnership information and remand for further proceedings.

### 5. Contractual Indemnity for Legal Fees

In Kessler's fifth and seventh issues, he contends, citing only Section 7.4 of the partnership agreements, the court erred in refusing to find that he was entitled to contractual indemnity for legal fees untethered to any prevailing-party concept under the partnership agreements, and that the court erred in determining that Slomowitz was a prevailing party, entitling him to claim over $600,000 in attorneys' fees.

To assess these claims, we first recognize that under the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an

adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception. *Trizechahn Gateway LLC v. Titus*, 976 A. 2d 474 (Pa. 2009). Having found against Kessler on all his counterclaims, the trial court denied Kessler's claims for attorneys' fees. On the other hand, the court granted Slomowitz's prayer for relief for reimbursement of counsel fees, legal costs and expenses in connection with the business of the partnerships, all to be determined at a subsequent hearing.

Section 7.4 to the Hershey and Hanover partnership agreements relating to indemnification of a general partner provides:

> The General Partners shall be indemnified and saved harmless by the Partnership from any loss, cost or damage incurred by them by reason of any act performed by them within the scope of the authority conferred on them by this Agreement, except for acts of gross negligence or intentional misrepresentation, provided that any indemnity under this Paragraph shall be paid out of and to the extent of Partnership assets only. The Partnership shall reimburse the General Partners for any such loss, cost or damage incurred.

Section 7.4 to the First Valley agreement is identical, except that it excludes from indemnification acts of "malfeasance." Although not cited by Kessler, we further observe that Section 17.9 of the partnership agreements, relating to attorneys' fees, provides:

> It is agreed that in the event any party to this Agreement shall be required to initiate legal proceedings to enforce performance of any term or condition in this Agreement, including but not limited to the payment of monies or the enjoining of any action prohibited hereunder, the prevailing party shall be entitled to recover such sums, in addition to any other damages or compensation

reserved, as will reimburse such prevailing party for reasonable attorney's fees and court costs incurred on account thereof.

We find that we are in agreement with Slomowitz that to the extent Kessler seeks reimbursement of attorneys' fees not incurred in connection with his activities as a general partner, but for fees related to litigation, Kessler is not entitled to indemnification under Section 7.4. The clear and unambiguous language of that section limits indemnification for any losses, costs, or damages by reason of acts performed by a general partner within the scope of their authority conferred on them by the agreement. We interpret this to only apply to the performance of partnership duties. To be sure, the agreements separately provide for recovery of litigation fees and court costs under Section 17.9. Recovery of those monies is conditioned upon a party prevailing in legal proceedings. Because Section 17.9 of the partnership agreements specifically addresses recovery of monies related to prevailing-party litigation, we cannot infer that the more general provisions of Section 7.4, relating to performance of a partner's duties, also would provide reimbursement for these litigation expenses untethered to being a "prevailing" party as argued by Kessler. A "'clear' provision controls a doubtful one, and a general provision must give way to a specific provision covering the same subject matter." *Cusamano v. Anthony M. DiLucia, Inc,* 421 A.2d 1120, 1123-24 (Pa. Super. 1980).

Applying these authorities to the instant matter, we find we must reverse the trial court's conclusion that Kessler is not entitled to recovery of his litigation expenses. Since we have reversed and are remanding on a number of Kessler's counterclaims, the court will have to assess entitlement to recovery of litigation expenses upon its re-examination of Kessler's claims. A judgment in Kessler's favor on some or all of his counterclaims also may affect the litigation expenses that Slomowitz might be entitled to depending upon a reexamination of prevailing-party status.

**6.     Kessler's Entitlement to Compensatory and Punitive Damages**

In his last issue, Kessler argues that the trial court erred in refusing to award him any compensatory or punitive damages regarding Slomowitz's actions. The court logically never reached the issue of damages claimed by Kessler because it found against him on all of his counterclaims. Now that the landscape of this case has changed, it will be up to the trial court to determine whether or not Kessler is entitled to any damages, and of what nature, upon remand. Accordingly, it would be premature for this Court to offer any opinions on those yet undetermined damages or the nature of the damages to which Kessler may be entitled.

**IV.    Conclusion**

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion. Jurisdiction relinquished.

55

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2021